NOT YET SCHEDULED FOR ORAL ARGUMENT

No. 24-7027

IN THE UNITED STATES COURT OF APPEALS
FOR THE DISTRICT OF COLUMBIA CIRCUIT

DARIAN MCKINNEY,
APPELLANT,

V.

DISTRICT OF COLUMBIA,
APPELLEE.

ON APPEAL FROM A JUDGMENT OF THE
UNITED STATES DISTRICT COURT FOR THE DISTRICT OF COLUMBIA

**BRIEF FOR APPELLEE THE DISTRICT OF COLUMBIA**

BRIAN L. SCHWALB
Attorney General for the District of Columbia

CAROLINE S. VAN ZILE
Solicitor General

ASHWIN P. PHATAK
Principal Deputy Solicitor General

THAIS-LYN TRAYER
Deputy Solicitor General

HOLLY M. JOHNSON
Senior Assistant Attorney General
Office of the Solicitor General

Office of the Attorney General
400 6th Street, NW, Suite 8100
Washington, D.C. 20001
(202) 442-9890
holly.johnson@dc.gov

**CERTIFICATE AS TO PARTIES, RULINGS, AND RELATED CASES**

A.      *Parties and amici*.—The plaintiff below and appellant here is Darian McKinney.  The defendant below and appellee here is the District of Columbia. There were no *amici curiae* in the district court.

B.      *Rulings under review*.—Appellant appeals from the district court's January 31, 2024 order (Jackson, J.) granting the District's motion to dismiss his complaint (ECF No. 11).  The decision is unreported but available on Westlaw at 2024 WL 358229.

C.      *Related cases*.—This case has not previously been before this Court or any other court.  Counsel is not aware of any related cases.

## TABLE OF CONTENTS

STATEMENT OF THE ISSUES .............................................................................1

STATEMENT OF THE CASE ...............................................................................2

    1.     McKinney's Complaint ...........................................................................2

          A.     DCPS finds that McKinney engaged in sexual harassment but his position is eliminated before he is subjected to disciplinary action .......................................................................2

          B.     McKinney is offered a position at another DCPS school but fails his background check, and the position is filled by the time he prevails on appeal .................................................4

          C.     DCPS and McKinney enter into a settlement agreement to resolve DCPS's finding that he engaged in sexual harassment and its decision to "excess" him .............................5

          D.     In an email, DCPS allegedly tells McKinney that he has failed a background check .........................................................7

    2.     The District Court's Dismissal Order ...................................................8

STANDARD OF REVIEW .....................................................................................9

SUMMARY OF ARGUMENT .............................................................................10

ARGUMENT ........................................................................................................12

    I.     McKinney Does Not Plausibly Allege That DCPS Deprived Him Of A Constitutionally Protected Property Interest .............................12

          A.     McKinney has both forfeited and unequivocally released any claim arising out of his original position with DCPS, and such a claim also lacks merit .............................13

          B.     McKinney has no legitimate claim of entitlement to "eligibility" for reemployment, nor could such entitlement create a constitutionally protected property interest ................20

      C.     McKinney has forfeited any claim arising out of job offers allegedly made by school principals, and, in any event, those offers could not have been binding on DCPS ................30

II.    McKinney Has Forfeited The Only Liberty-Interest Claim He Pursues On Appeal And, In Any Event, Does Not Plausibly Allege That DCPS Infringed Upon A Constitutionally Protected Liberty Interest ....................................................................31

      A.     McKinney has forfeited his "reputation plus" claim on appeal and, alternatively, cannot satisfy either of its essential elements....................................................................33

      B.     McKinney has forfeited his "stigma plus" claim and, alternatively, does not allege that he was unable to find work in his chosen field ............................................36

      C.     McKinney did not preserve a "debarment" claim in the district court, nor, in any event, would such a claim have merit ................................................................................40

III.   McKinney's Complaint Does Not Plausibly Allege That The District Breached An Implied Covenant Of Good Faith And Fair Dealing ..............................................................................49

CONCLUSION .....................................................................54

# TABLE OF AUTHORITIES*

## *Cases*

*\*Abdelfattah v. U.S. Dep't of Homeland Sec.*,
   787 F.3d 524 (D.C. Cir. 2015)................................................................32, 38, 39

*Abdelrhman v. Ackerman*, 76 A.3d 883 (D.C. 2013) ........................................19, 50

*Al-Tamimi v. Adelson*, 916 F.3d 1 (D.C. Cir. 2019) ................................................13

*Alvin v. Suzuki*, 227 F.3d 107 (3d Cir. 2000)...........................................................49

*Anderson v. City of Philadelphia*, 845 F.2d 1216 (3d Cir. 1988)...........................29

*Apprio, Inc. v. Zaccari*, 104 F.4th 897 (D.C. Cir. 2024) ........................................22

*Ashcroft v. Iqbal*, 556 U.S. 662 (2009) ......................................................................9

*Ass'n of Accredited Cosmetology Sch. v. Alexander*, 979 F.2d 859 (1992)............23

*\*Bd. of Regents of State Colls. v. Roth*, 408 U.S. 564 (1972) ...........................20, 21

*Beck v. Cont'l Cas. Co.*, 936 A.2d 747 (D.C. 2007).................................................50

*Bell Atl. Corp. v. Twombly*, 550 U.S. 544 (2007)......................................................9

*Blantz v. Cal. Dep't of Corr. & Rehab., Div. of Corr. Health Care Servs.*,
   727 F.3d 917 (9th Cir. 2013) ........................................................................39, 44

*\*Bolling Fed. Credit Union v. Cumis Ins. Soc'y*,
   475 A.2d 382 (D.C. 1984) .............................................................14, 15, 16, 34

*Bragdon v. Twenty-Five Twelve Assocs.*, 856 A.2d 1165 (D.C. 2004) .............22, 50

*Burns v. Sullivan*, 619 F.2d 99 (1st Cir. 1980) ........................................................26

*Campbell v. Champaign*, 940 F.2d 1111 (7th Cir. 1991) ........................................25

---

\*     Authorities upon which we chiefly rely are marked with asterisks.

iv

*Campbell v. District of Columbia*, 894 F.3d 281 (2018) ...................................41, 42

*Clemente v. United States*, 766 F.2d 1358 (9th. Cir. 1985) ......................................44

*Clukey v. Town of Camden*, 717 F.3d 52 (1st Cir. 2013) ........................................20

*Codd v. Velger*, 429 U.S. 624 (1977) .......................................................................35

*Crooks v. Mabus*, 845 F.3d 412 (D.C. Cir. 2016) ...................................................35

*District of Columbia v. Greene*, 806 A.2d 216 (D.C. 2002) ..............................23, 24

*Doe v. Cheney*, 885 F.2d 898 (D.C. Cir. 1989) .......................................................33

*Doe v. U.S. Dep't of Just.*, 753 F.2d 1092 (D.C. Cir. 1985) ..............................31, 33

*DSP Venture Grp. v. Allen*, 830 A.2d 850 (D.C. 2003) ...........................................50

*Dyer v. Bilaal*, 983 A.2d 349 (D.C. 2009) ...............................................................22

*E. Shore Mkts., Inc. v. J.D. Assocs.*, 213 F.3d 175 (4th Cir. 2000) ........................51

*Esparraguera v. Dep't of the Army*, 101 F.4th 28 (D.C. Cir. 2024) ..................27, 28

*Ferencz v. Hairston*, 119 F.3d 1244 (6th Cir. 1997) ...............................................26

*Gen. Elec. Co. v. Jackson*, 610 F.3d 110 (D.C. Cir. 2010) ....................................35

*Geiger v. Crestar Bank*, 778 A.2d 1085 (D.C. 2001) ..............................................50

*Gilbert v. Homar*, 520 U.S. 924 (1997) ...................................................................20

*Gov't of Manitoba v. Bernhardt*, 923 F.3d 173 (D.C. Cir. 2019) ...........................34

*Grand Hyatt Wash. v. D.C. Dep't of Emp't Servs.*,
    963 A.2d 142 (D.C. 2008) ................................................................................49, 50

*Hargray v. City of Hallandale*, 57 F.3d 1560 (11th Cir. 1995) ........................17, 18

*Harhay v. Town of Ellington Bd. of Educ.*, 323 F.3d 206 (2d Cir. 2003) ...............28

*\*Jones v. City of Boston*, 752 F.3d 38 (1st Cir. 2014) .......................................27, 31

*Jordan v. Stroughter*, 2022 WL 620119 (6th Cir. 2022) .................................25, 26

Kartseva v. Dep't of State, 37 F.3d 1524 (D.C. 1994) ...................32, 38, 41, 42, 46

Ky. Dep't of Corr. v. Thompson, 490 U.S. 454 (1989)...........................................13

*Langeman v. Garland*, 88 F.4th 289 (D.C. Cir. 2023) .................33, 36, 43, 44, 45

Lea v. District of Columbia, 2024 WL 3042182 (D.C. Cir. 2024).............32, 41, 47

Lea v. District of Columbia, No. CV 22-1396 (JEB),
    2022 WL 3153828  (D.D.C. Aug. 8, 2022) ........................................................47

*Llamas v. Butte Cmty. Coll. Dist.*, 238 F.3d 1123 (9th Cir. 2001) .................43, 44

*MacFarlane v. Grasso*, 696 F.2d 217 (2d Cir. 1982) ...........................................26

Massó-Torrellas v. Municipality of Toa Alta, 845 F.3d 461 (1st Cir. 2017)...........24

*McCormick v. District of Columbia*, 752 F.3d 980 (D.C. Cir. 2014)........35, 36, 48

Molerio v. FBI, 749 F.2d 815 (D.C. Cir. 1984) ......................................................21

Moore v. Agency for Int'l Dev., 80 F.3d 546 (D.C. Cir. 1996) ..............................46

Moore v. Muncie Police & Fire Merit Comm'n, 312 F.3d 322 (7th Cir. 2002)......26

Mosrie v. Barry, 718 F.2d 1151 (D.C. Cir. 1983) ..................................................33

N. Am. Butterfly Ass'n v. Wolf, 977 F.3d 1244 (D.C. Cir. 2020) .............................3

Old Dominion Dairy Prods. v. Sec'y of Def.,
    631 F.2d 953 (D.C. Cir. 1980)............................................................................47

*O'Donnell v. Barry*,
    148 F.3d 1126 (D.C. Cir. 1998).............................. 32, 33, 36, 37, 38, 39, 41, 46

Omni Behav. Health v. Miller, 285 F.3d 646 (8th Cir. 2002)..................................25

Orange v. District of Columbia, 59 F.3d 1267 (D.C. Cir. 1995).......................31, 33

Owens v. BNP Paribas, S.A., 897 F.3d 266 (D.C. Cir. 2018) ...................................3

*Parker v. Columbia Bank*, 604 A.2d 521 (Md. Ct. Spec. App. 1992)....................51

*Rathjen v. Litchfield*, 878 F.2d 836 (5th Cir. 1989)....................................18

*Redondo-Borges v. U.S. Dep't of Hous. & Urb. Dev.*,
    421 F.3d 1 (1st Cir. 2005)....................................................24

*Riddell v. Riddell Wash. Corp.*, 866 F.2d 1480 (D.C. Cir. 1989)...........................20

*Roberts v. United States*, 741 F.3d 152 (D.C. Cir. 2014) ........................................13

*S & D Maint. Co. v. Goldin*, 844 F.2d 962 (2d Cir. 1988) ......................................25

\*Sibley v. St. Albans Sch.*, 134 A.3d 789 (D.C. 2016)........................................51, 53

*Smith v. Mallick*, 514 F.3d 48 (D.C. Cir. 2008)........................................15

*Stana v. School Dist. of City of Pittsburgh*, 775 F.2d 122 (3d Cir. 1985).........28, 29

\*Stone v. Univ. of Md. Med. Sys. Corp.*, 855 F.2d 167 (4th Cir. 1988).......17, 18, 19

*Sundberg v. TTR Realty, LLC*, 109 A.3d 1123 (D.C. 2015).............................50, 51

*Taylor v. Resol. Tr. Corp.*, 56 F.3d 1497 (D.C. Cir. 1995) ..............................32, 37

\*Teigen v. Renfrow*, 511 F.3d 1072 (10th Cir. 2007) .......................................23, 25

*Thompson v. District of Columbia*, 978 A.2d 1240 (D.C. 2009)...........................21

\*Tinius v. Choi*, 77 F.4th 691 (D.C. Cir. 2023) ...........................................14, 30, 41

*Town of Castle Rock v. Gonzales*, 545 U.S. 748 (2005)...................................20, 23

*Trifax Corp. v. District of Columbia*, 314 F.3d 641 (D.C. Cir. 2003)..............32, 45

*Tundo v. County of Passaic*, 923 F.3d 283 (3d Cir. 2019) .....................................29

*Unger v. Nat'l Residents Matching Program*, 928 F.2d 1392 (3d Cir. 1991).........25

*Wright v. Eugene & Agnes E. Meyer Found.*, 68 F.4th 612 (D.C. Cir. 2023)...........9

*Wright v. Howard Univ.*, 60 A.3d 749 (D.C. 2013) .................................................50

*Yatvin v. Madison Metro. Sch. Dist.*, 840 F.2d 412 (7th Cir. 1988)........................25

## Statutes and Regulations

D.C. Code § 1-608.01a...............................................................................21, 27, 31

D.C. Code § 4-1501.03 ............................................................................24, 30, 40

D.C. Code § 4-1501.05 .........................................................................................40

D.C. Code § 4-1501.05a.....................................................................2, 24, 47, 48

D.C. Code § 4-1501.08 ...............................................................................35, 40

D.C. Code § 12-301 .............................................................................................20

D.C. Code § 38-174 .............................................................................................21

5A DCMR § 1602.1 .............................................................................................24

5E DCMR § 1006.6 ...............................................................................21, 29, 30

5E DCMR § 1400.2 ...............................................................................21, 27, 31

5E DCMR § 1401 .................................................................................................21

6B DCMR § 406.9 ...........................................................................................42, 44

6B DCMR § 406.10 .........................................................................................43, 44

## Other

*Allow*, Black's Law Dictionary (4th ed. 1968) ..........................................22

*Allow*, Cambridge Dictionary, https://tinyurl.com/9w43c2uy................................22

*Apply*, Black's Law Dictionary (12th ed. 2024) ..................................................22, 23

## STATEMENT OF THE ISSUES

Darian McKinney was employed by the District of Columbia Public Schools ("DCPS") from 2015 to 2019. In 2019, DCPS found him guilty of sexual harassment, but he was "excessed" (laid-off) before any disciplinary action was taken. Both matters were resolved in a settlement agreement, in which McKinney agreed to release any claims and take the "buyout" available to excessed teachers, and DCPS agreed to remove the sexual harassment finding from his official personnel file and excuse him from the "buyout" option's three-year ban on reemployment. In subsequent years, McKinney applied for new positions at DCPS but was not rehired. He alleges that DCPS falsely told him that he failed his background check and claims that DCPS violated his right to procedural due process and breached his contractual right to apply for new positions. The district court dismissed his complaint for failure to state a claim. His appeal raises three issues:

1. Whether he plausibly alleges that DCPS deprived him of a constitutionally protected property interest, where he has both forfeited and expressly released any claim arising out of the position he held before his separation and, in any event, does not assert any legitimate claim of entitlement to reemployment.

2. Whether he plausibly alleges that DCPS deprived him of a liberty interest, where the only claim he raises on appeal was forfeited in the district court and,

alternatively, he has not stated a claim for a "reputation-plus" violation, a "stigma-plus" violation, or a "debarment" violation.

3.    Whether the complaint plausibly alleges that DCPS breached the settlement agreement's implied covenant of good faith and fair dealing by failing to rehire him, where DCPS satisfied its promise to allow him to apply for new positions and an implied covenant cannot require DCPS to do more than the contract provides.

## STATEMENT OF THE CASE

**1.    McKinney's Complaint.**

McKinney's complaint alleges the following facts, taken as true at this stage.

### A.    DCPS finds that McKinney engaged in sexual harassment but his position is eliminated before he is subjected to disciplinary action.

McKinney is a certified health and physical education teacher who taught at DCPS from 2015-2019.  JA 4-5.  Before he was hired in 2015, DCPS "made a determination that [he] had failed a background check."  JA 5.  He appealed that determination to the D.C. Commission on Human Rights under D.C. Code § 4-1501.05a(c) and "had it successfully overturned."  JA 5.  After that, he taught without incident from 2015 to 2017.  JA 5.

McKinney alleges that, during the 2018-2019 school year, an "event" took place "which caused DCPS to conduct a new background check on [him]."  JA 5.  His complaint does not explain this "event," but it incorporates a settlement agreement showing that, around that same time, he was accused of sexual

harassment and placed on administrative leave pending an investigation.  *See* JA 6 (alleging that he was on "administrative leave" while an unspecified "separate dispute" was "litigated administratively"), 7 (alleging that the settlement "resolved all the issues between them"), 24 (clause in settlement agreement referencing "sexual-harassment allegations").[1]  DCPS later notified McKinney that the sexual harassment allegation had been "substantiated."  JA 24.

It is not clear from the complaint whether DCPS proposed disciplinary action. *See* JA 5-6.  But it is clear that, before any such action became final, McKinney's position was eliminated, and he was "excessed" under a process established by the collective bargaining agreement ("CBA") between DCPS and Washington Teachers Union.  *See* JA 24 (acknowledging McKinney's selection of a $25,000 buyout under the "Excessing option[] offered to teachers pursuant to Article 4.5 of the [CBA]").  An "excess" is "an elimination of a Teacher's position at a particular school."  CBA 5.[2]  When this occurs, a committee made up of DCPS and union representatives recommends which teachers should be "excessed" based on the teachers'

---

[1]     When reviewing the grant of a motion to dismiss, this Court "consider[s] any documents either attached to or incorporated in the complaint." *N. Am. Butterfly Ass'n v. Wolf*, 977 F.3d 1244, 1249 (D.C. Cir. 2020).

[2]     The settlement agreement incorporates the "Excessing" provisions of the CBA. *See Owens v. BNP Paribas, S.A.*, 897 F.3d 266, 273 (D.C. Cir. 2018) ("Public records are subject to judicial notice on a motion to dismiss when referred to in the complaint and integral to the plaintiff's claim.").  The 2016-2019 CBA is available at https://tinyurl.com/4j6mzp96.

performance evaluations, unique skills and qualifications, length of service, and other contributions to the educational community.  *See* CBA 28, 53.

Excessed teachers who are not eligible for retirement have two options: "Buyout" or "Extra Year."  CBA 30-31.  Those who opt for "Buyout" receive "a $25,000 cash buyout resulting in separation from DCPS" and "shall not be eligible for employment with DCPS for a period of three (3) years."  CBA 30.  Teachers who instead opt for the "Extra Year" remain employed for one more year in "instructional support capabilities."  CBA 31-32.  These teachers are eligible for reemployment at any time and, if rehired within one year, "incur no break in service for pension purposes."  CBA 32-33.

### B.    McKinney is offered a position at another DCPS school but fails his background check, and the position is filled by the time he prevails on appeal.

At some point before the summer of 2019, DCPS and McKinney began administrative litigation over the substantiated sexual-harassment allegation and the decision to "excess" him after his position was eliminated.  *See* JA 6 (alleging that a "dispute" was "litigated administratively"), 7 (alleging that the settlement agreement "resolved all the issues between them"), 24 (clause in settlement agreement confirming that it resolved claims "related to [his] separation from DCPS and any related substantiated sexual-harassment allegations").

4

In the meantime, he began looking for positions at other DCPS schools—as was his right under the "excessing" process.  *See* JA 6; CBA 29-30.  In the summer of 2019, the principal of Kelly Miller Middle School offered him a teaching position. JA 6.  But McKinney was later "advised by email that . . . the DCPS Office of Security had found him ineligible because of a failed background check," JA 6, and that he would "receive further notification about this decision by mail from the Office of School Security."  JA 9.  After that, the Office of Security sent him "a paper, written notice of its determination, accompanied by instructions for the appeals process."  JA 9.  McKinney appealed the determination to the Commission on Human Rights, which overturned it later that summer.  JA 6-7.  By then, however, the position was no longer available.  JA 7.

### C.   DCPS and McKinney enter into a settlement agreement to resolve DCPS's finding that he engaged in sexual harassment and its decision to "excess" him.

In November 2019, DCPS and McKinney entered into a settlement agreement that resolved their disputes arising out of the substantiated sexual harassment allegation and the decision to "excess" him after his position was eliminated.  JA 24-26.  McKinney agreed to "irrevocably and unconditionally waive, release, acquit and forever discharge DCPS from . . . all rights, claims and liability, whether or not they are presently known to exist, that Mr. McKinney . . . has or may have against DCPS arising out of or relating in any manner to Mr. McKinney's

termination of employment . . . with DCPS." JA 25. As part of this release, McKinney explicitly waived "all other rights and claims []he has or may have under all other constitutional, federal, state and local laws . . . arising out of or relating in any manner to his termination of employment . . . with DCPS." JA 26.

In exchange, DCPS provided McKinney the most favorable aspects of each of the "excessing" options. From the "Buyout" option, he was able to resign and take the "$25,000 cash buyout." CBA 30; *see* JA 24 (agreement to resign and accept the "$25,000 . . . Excessing option[] offered to teachers pursuant to [the CBA]"). But DCPS agreed that he would not be subject to that option's three-year bar on reemployment. *See* CBA 30. Instead, similar to teachers who opt for the "Extra Year," he was "allowed to apply for teaching positions at DCPS starting the 2020-2021 school year" and, if rehired with one year, would have "no break in service for retirement (pension) purposes, in accordance with Article 39.8.3 of the [CBA]." JA 24-25; *see* CBA 33 (providing that "Extra Year" teachers "shall incur no break in service for pension purposes" "[i]f rehired within one year of separation,"), 102 (CBA Article 39.8.3: same for teachers separated under a reduction in force). DCPS also agreed to "[r]emove any investigation and notice of the substantiated sexual-harassment allegation from [his] Official Personnel Folder." JA 24.

6

The settlement agreement was signed by DCPS's General Counsel, the president of Washington Teachers Union, and McKinney. JA 26-27.

### D. In an email, DCPS allegedly tells McKinney that he has failed a background check.

In July 2020, the principal of Kelly Miller Middle School again offered McKinney a position. JA 8. Again, his "name was submitted for administrative processing, including the mandatory background check." JA 8. McKinney alleges that, a month later, he was again "advised by email that the DCPS Career Office had been informed that the DCPS Office of Security had found him ineligible because of an allegedly 'failed' background check." JA 8.

McKinney alleges that "no background check . . . had, in fact, been conducted." JA 8. When he failed his background checks in 2015 and 2019, the informal email notifications were followed by formal "written determination[s] and appeals instructions from the DCPS Office of Security." JA 9. This time, however, he "never received any written notice from the DCPS Office of Security." JA 10. He "repeatedly contacted DCPS requesting to appeal" the determination, but "DCPS never responded." JA 10. McKinney does not allege that he tried to pursue an appeal before the Commission on Human Rights, as he had done successfully twice before. *See* JA 10-11.

In early 2021, he applied for other DCPS positions, but DCPS again allegedly responded with "email advisements . . . that the DCPS Office of Security had

7

deemed him ineligible for hire due to a 'failed' background check." JA 11. According to McKinney, "no background checks were, in fact, conducted" and "there was no legitimate basis on which [he] could have 'failed'" them. JA 11-12. Again, he "never received . . . any mailed written determination and advice of rights from the DCPS Office of Security." JA 11. And, again, he does not claim to have made any effort to appeal to the Commission on Human Rights. *See* JA 11-12. Instead, he "repeatedly contacted DCPS to try to appeal" but "received no responses." JA 12. He alleges that similar exchanges took place in the spring of 2021. *See* JA 12-13. At some point during these events, he was "informed that DCPS personnel were instructed by DC personnel with authority over them not to effectuate [his] hiring." JA 14.

Sometime within the next year, McKinney began teaching and coaching at a public school in Prince George's County, Maryland. *See* JA 5.

## 2.    The District Court's Dismissal Order.

McKinney sued the District, claiming that DCPS: (1) deprived him of property interests without due process by "failing to process" the offers he received for some positions and "preclud[ing] him from being considered" for others, JA 20-21; (2) deprived him of a liberty interest without due process by "falsely labeling him as someone who presents a danger to children and youth, and who is ineligible to teach in D.C.," JA 21; and (3) breached the settlement agreement's

8

"implied covenant of good faith and fair dealing" by "falsely claiming that [he] 'failed' [a] background check" and "not permitting him to appeal," JA 18-19.

The district court dismissed all three claims. *First*, it dismissed McKinney's property-interest claim because he had no "legitimate claim of entitlement" to any new position with DCPS. JA 39. *Second*, it dismissed his liberty interest claims, holding that he could not recover under a "reputation-plus" theory because "he was neither discharged nor demoted," JA 40-41, or under a "stigma" theory because "the fact that [he] currently teaches and coaches at a public school in Maryland" belied any inference that he was "effectively 'foreclosed' from some category of work." JA 41-42. *Third*, it dismissed his contract claim because any implied covenant of good faith and fair dealing "is bounded by the scope of the contract," which only guaranteed "[his] right to re-apply for employment, not to be accepted." JA 37.

## STANDARD OF REVIEW

"This Court reviews a district court's decision granting a motion to dismiss for failure to state a claim *de novo*." *Wright v. Eugene & Agnes E. Meyer Found.*, 68 F.4th 612, 619 (D.C. Cir. 2023). To survive a motion to dismiss, "a complaint must contain sufficient factual matter, accepted as true, to 'state a claim to relief that is plausible on its face.'" *Ashcroft v. Iqbal*, 556 U.S. 662, 678 (2009) (quoting *Bell Atl. Corp. v. Twombly*, 550 U.S. 544, 570 (2007)).

## SUMMARY OF ARGUMENT

1. The district court properly dismissed McKinney's property-based due process claims because he does not plausibly allege that DCPS deprived him of a constitutionally protected property interest. Only one of the three claims he raises in his opening brief was preserved in the district court, though none have merit.

*First*, McKinney argues that he had a property interest in the position he held before his resignation. But he forfeited this claim by failing to raise it in the district court. And forfeiture aside, he explicitly released any such claim in the settlement agreement. In any event, his voluntary resignation extinguished any constitutionally protected interest in continued employment.

*Second*, he argues that the settlement agreement gave him a property interest in "eligibility" for reemployment. But nothing in the settlement agreement predetermined his eligibility for any teaching position he sought. And even if it had, that guarantee could not have created a property interest because DCPS did not promise to rehire him. And even if DCPS had promised to rehire him, such a promise could not have created a property interest because DCPS could have terminated him without cause during his one-year probationary period.

*Third*, McKinney claims that the job offers he received from school principals gave him a property interest in those positions. But he forfeited this claim by failing to raise it in the district court. It also lacks merit because school administrators

10

cannot make final hiring decisions—only the Chancellor has that authority. Moreover, as discussed, even a binding offer could not have created a property interest because DCPS could have terminated him without cause during his probationary period.

2.  The district court also properly dismissed McKinney's liberty-interest due process claims.  This Court recognizes three theories under which such a claim can be brought: "reputation plus," "stigma plus," and "debarment."  McKinney pursued the first two in the district court but abandons them on appeal, and he did not raise the third in the district court.  Even if this Court were to consider these forfeited claims, however, none has merit.

*First*, under "reputation plus," the employee must (1) be defamed (2) in conjunction with termination or demotion.  McKinney alleges neither element.

*Second*, under a "stigma plus" theory, the employee must be broadly precluded from employment in his chosen field.  But McKinney found comparable work in a neighboring school district before he even filed his complaint.

*Third*, under a "debarment" theory, the government must have made a formal determination that automatically excluded the plaintiff from employment in his chosen field.  McKinney, however, alleges that DCPS did *not* make a formal determination that he failed a background check.  And if it had, McKinney was not

deprived of the process he was due: a statutorily guaranteed opportunity to appeal to the Commission on Human Rights.

Moreover, even if McKinney could clear these hurdles, his claim is meritless because an adverse background determination only automatically bars the teacher from serving in the particular job he sought. And even if DCPS exercises its discretion to apply that adverse determination to future applications, it can do so for only one year. What is at most a one-year preclusion from employment with a single municipal agency simply does not rise to the level of a constitutional deprivation.

3. McKinney also failed to plausibly allege that DCPS violated the settlement agreement's implied covenant of good faith and fair dealing. He assumes that the clause allowing him to reapply must have given him some benefit exceeding the rights of ordinary applicants. In context, however, the extra benefit that the clause provided was exemption from the three-year bar on reemployment that otherwise would have accompanied his selection of the $25,000 buyout. DCPS therefore fully satisfied its express and implied obligations under the settlement agreement.

## ARGUMENT

### I.    McKinney Does Not Plausibly Allege That DCPS Deprived Him Of A Constitutionally Protected Property Interest.

"In order to make out a violation of due process, the plaintiff must show the Government deprived h[im] of a 'liberty or property interest' to which []he had a 'legitimate claim of entitlement,' and that 'the procedures attendant upon that

12

deprivation were constitutionally [in]sufficient." *Roberts v. United States*, 741 F.3d 152, 161 (D.C. Cir. 2014) (quoting *Ky. Dep't of Corr. v. Thompson*, 490 U.S. 454, 460 (1989)).  McKinney's claim fails at the first step because he has not identified any property interest implicated by DCPS's alleged actions.  *First*, he has both forfeited and unequivocally released any claim arising out of his original job with DCPS, which in any event lacks merit.  *Second*, the plain terms of the settlement agreement confirm that he had no legitimate claim of entitlement to reemployment with DCPS.  *Third*, he has forfeited any claim arising out of employment offers he received, and, in any event, does not plausibly allege that those contingent offers gave him any legitimate claim of entitlement to reemployment.[3]

### A. McKinney has both forfeited and unequivocally released any claim arising out of his original position with DCPS, and such a claim also lacks merit.

For the first time in this litigation, McKinney argues that DCPS deprived him of his right to continue working in the position he held before his resignation.  Br. 18-20.  This Court should reject this claim for any of three independent reasons.

---

[3]    McKinney has not preserved his district-court claim to a property interest in having his applications "handled fairly and in good faith."  District Court ECF Record Document ("RD") 8 at 6; *see Al-Tamimi v. Adelson*, 916 F.3d 1, 6 (D.C. Cir. 2019) ("A party forfeits an argument by failing to raise it in his opening brief.").  Nor is there any merit to this claim because "a 'fair . . . process' is still a process, not a substantive interest in liberty or property."  *Roberts*, 741 F.3d at 162.

*First*, McKinney has forfeited this claim by failing to raise it below. *See Tinius v. Choi*, 77 F.4th 691, 698 (D.C. Cir. 2023) (holding that claims not raised in the district court are forfeited on appeal). His complaint identifies three property interests: (1) his alleged "2020 hiring for the position at Kelly Miller M.S."; (2) his right to "consider[ation] for the positions for which he applied in 2021"; and (3) his alleged "2021 hiring for the position at Elliot Hine M.S." JA 20-21. There is simply no mention of any property interest in continued employment in his prior position.

Nor did McKinney identify such a property interest in opposition to the District's motion to dismiss. *See* RD 7 at 6-9. Indeed, he made clear that this was *not* his claim, arguing that the "source of [his] property interest" was the "settlement agreement." RD 8 at 8. McKinney now complains that the district court's focus was "too narrow" because it "ignor[ed]" his claim that the District "induc[ed] him to resign." Br. 19. But the district court could not possibly have known he was raising such a claim, given his failure to mention it in any of his filings.

*Second*, even ignoring his forfeiture below, McKinney has explicitly and irrevocably released any claim arising out of his right to continued employment with DCPS in the settlement agreement attached to his complaint. If a release is "facially unambiguous," courts "must rely solely upon its language as providing the best objective manifestation of the parties intent." *Bolling Fed. Credit Union v. Cumis*

14

*Ins. Soc'y*, 475 A.2d 382, 385 (D.C. 1984).[4]  And a release provision that covers "all claims *of any kind or character*" that the signatory *"has or may have . . .* as of the execution date" necessarily "encompass[es] losses of which [the signatory] had knowledge, as well as those which existed but were not yet identified, at the time the release was signed." *Id.*

The release signed by McKinney is facially unambiguous and explicitly releases the District from any claim arising out of his right to continued employment with DCPS—the very dispute at the heart of the settlement agreement.  A clause describing the scope of the agreement states that the parties "agree that any and all claims which may arise or have arisen from his separation of employment with DCPS are hereby fully and finally settled," such that McKinney's "separation from DCPS and related substantiated sexual harassment allegations may not be the subject of any complaint, action, another administrative appeal, or any additional litigation." JA 24.  Then, in the release clause, McKinney agreed to:

> irrevocably and unconditionally waive, release, acquit and forever discharge DCPS from . . . all rights, claims and liability, whether or not they are presently known to exist, that Mr. McKinney . . . has or may have against DCPS arising out of or relating in any manner to Mr. McKinney's termination of employment by and separation of employment with DCPS.

---

[4]     A settlement agreement is a contract, which this Court analyzes under local law.  *See Smith v. Mallick*, 514 F.3d 48, 50 (D.C. Cir. 2008).

JA 25. The settlement agreement thus extinguished any claim he could have had, constitutional or otherwise, arising out of his status as a career-service employee with DCPS. *See Bolling Fed. Credit Union*, 475 A.2d at 385.

McKinney does not address this barrier to suit or suggest, for example, that he was denied an opportunity to read this release before he (and his union president) signed the agreement. *See* JA 26. He offers no authority, or even reasoned argument, explaining how he could have a property interest in continued employment when he exchanged that interest for contractual rights enforceable under the common law—including a $25,000 "Buyout" and removal of the substantiated finding of sexual harassment from his official personnel file, which left him free to find work as a teacher in other jurisdictions. *See* JA 24. He did not ask the district court to invalidate the settlement agreement, nor does seek such relief on appeal. *See* RD 8 at 6-8; Br. 18-20. This Court should thus reject the claim as permanently and irrevocably waived.

*Third*, even if this Court were to consider the merits of this forfeited and released claim, it must reject McKinney's insistence that he retains a property interest in his old job on the basis of a newly raised inducement theory. McKinney asserts for the first time that he did not voluntarily resign and instead was "induced" to resign with the promise that he could apply for new jobs. Br. 19. But McKinney

never raised inducement, or even plausibly alleged facts that could show inducement, in his complaint.

McKinney argues that a resignation can be construed as involuntary if it was obtained by "coercion or duress" or by "deceiving or misrepresenting a material fact to the employee." Br. 18 (citing *Hargray v. City of Hallandale*, 57 F.3d 1560, 1568 (11th Cir. 1995); *Stone v. Univ. of Md. Med. Sys. Corp.*, 855 F.2d 167, 174 (4th Cir. 1988)). But in the cases he cites, the plaintiffs were forced to make on-the-spot decisions to either resign or face immediate, serious consequences. *See Hargray*, 57 F.3d at 1565 (public-works supervisor was given "a few minutes alone" at police station to consider whether he would resign rather than face criminal charges of grand theft); *Stone*, 855 F.2d at 171 (surgeon was given several hours to decide whether to resign rather than face revocation of hospital privileges). And even in those situations, the courts held that the employees *had* voluntarily resigned. *See Hargray*, 57 F.3d at 1569 (holding that, because the employee had known about the criminal allegations against him for a few weeks, he "had ample opportunity to think long and hard about what he would do when he was called down [to the police station] for questioning"); *Stone*, 855 F.2d at 177 (holding that, despite the "time pressure," employee was able to "dictate[] the terms of his resignation himself").

McKinney's complaint does not allege that his resignation was involuntary, much less present facts plausibly inferring the type of coercion or misrepresentation

17

that could invalidate the settlement agreement. Indeed, the complaint asserts the opposite, alleging that McKinney and DCPS "resolved all the issues between them by entering into a written settlement agreement" and that, as part of that agreement, he "resigned his employment from DCPS." JA 7. And nothing in the complaint suggests that McKinney was forced into making an on-the-spot decision whether to resign or face irrevocable, serious consequences. *See Hargray*, 57 F.3d at 1565; *Stone*, 855 F.2d at 171. He was given notice of his proposed termination during the 2018-2019 school year, at least six months before he settled the dispute in November 2019. *See* JA 6-7, 25-26. During that time, he had ample opportunity to consult with counsel and union representatives. *See* JA 6-7, 26-27. Even if, as he claims, DCPS failed to comply with one of the terms of the settlement agreement, his remedy lies with judicial enforcement of the contractual rights he acquired. *See Rathjen v. Litchfield*, 878 F.2d 836, 839 (5th Cir. 1989) (rejecting due process claim based on city's failure to comply with a settlement agreement because, "if [the city] had carried through with [its] promises, the settlement would have been satisfactory to [the employee]"); JA 18-19 (Counts I-III, claiming relief for common-law "Breach of Contract").

Finally, it is important to note the logical consequence of McKinney's shifting positions. In the district court, he identified the settlement agreement as the sole source of the property interest underlying this claim. *See* RD 8 at 5-8, 12-14. In this

18

Court, he argues that his resignation under that agreement is invalid. *See* Br. 18-20. He cannot have it both ways. If his resignation is invalid, so too is the consideration provided by DCPS, including: (1) allowing him to take the $25,000 "Buyout" option while giving him some benefits only available under the "Extra Year" option; (2) promising not to take any "action" against him based on the sexual harassment finding (if he was rehired); and (3) promising to remove that finding from his official personnel file. JA 24; *see Abdelrhman v. Ackerman*, 76 A.3d 883, 890 (D.C. 2013) (noting that the plaintiff likely chose not to claim "fraud in the inducement" of a lease agreement because that claim "might nullify the contract and thereby narrow [his] potential remedies").

McKinney does not allege that, in the years following his resignation, he has ever attempted to rescind it or return the $25,000 buyout he accepted. And he certainly does not allege that, when he applied for a teaching position in Prince Georges County, he revealed that his official DCPS file contained a finding that he had engaged in sexual harassment. *See Stone*, 855 F.2d at 178 (finding "[a]ny lingering doubts . . . about the voluntariness of Stone's resignation" allayed by his failure to "make any effort to rescind his resignations or to request a hearing on the charges against him," his acceptance of severance, and his "represent[ation] . . . to third parties [that he] resigned . . . voluntarily").

19

It is now too late for McKinney to ask a court to invalidate the settlement agreement.  *See* D.C. Code § 12-301(a)(8) (establishing three-year residual limitations period); *Riddell v. Riddell Wash. Corp.*, 866 F.2d 1480, 1489-90 (D.C. Cir. 1989) (applying residual period to fraud claims).  But even if this barrier could be overcome, he has not sought such relief in *this* litigation and is therefore bound by the contract he signed.

### B.    McKinney has no legitimate claim of entitlement to "eligibility" for reemployment, nor could such entitlement create a constitutionally protected property interest.

"To have a property interest in a benefit, a person clearly must have more than an abstract need or desire for it.  He must have more than a unilateral expectation of it.  He must, instead, have a legitimate claim of entitlement to it."  *Bd. of Regents of State Colls. v. Roth*, 408 U.S. 564, 577 (1972).  "In general, 'a benefit is not a protected entitlement if government officials may grant or deny it in their discretion,'" so courts "look primarily to the discretion state law accords state actors to withhold the entitlement."  *Clukey v. Town of Camden*, 717 F.3d 52, 56 (1st Cir. 2013) (quoting *Town of Castle Rock v. Gonzales*, 545 U.S. 748, 756 (2005)).

Public employees who can only be terminated for "cause" have a "constitutionally protected property interest in their tenure."  *Gilbert v. Homar*, 520 U.S. 924, 928-29 (1997).  But that property interest attaches only after the employee is hired, because "there is of course no 'legitimate claim of entitlement' to be

20

appointed to a particular [governmental] job." *Molerio v. FBI*, 749 F.2d 815, 823 (D.C. Cir. 1984) (quoting *Roth*, 408 U.S. at 577); *see* 5E DCMR § 1006.6 (giving the DCPS Chancellor "discretionary authority to fill any position in the Educational Service").[5]  Indeed, DCPS teachers acquire career-service protection only after they have been hired *and* completed a one-year period of probation.  *See* D.C. Code § 1-608.01a(b)(2)(C)(i) (authorizing DCPS to terminate probationary teachers "without notice or evaluation"); 5E DCMR § 1401 (requiring "just cause" for adverse action against permanent employees); 5E DCMR § 1400.2(j) (excluding probationary employees from chapter).  A DCPS applicant thus has no property interest in the position he seeks.

Nothing in the settlement agreement constrains the Chancellor's discretion to make final hiring decisions or waives the one-year probationary period.  *See* JA 25-26.  McKinney's complaint thus fails to plausibly allege that the settlement agreement created a legitimate claim of entitlement to employment.  Nor does McKinney dispute this point.  Instead, he argues that the settlement agreement gave him a property interest in his "*eligibility to be rehired*."  Br. 20.  This is wrong for three independent reasons.

---

[5]     The powers and duties formerly held by the "Superintendent of Schools" are now held by the DCPS "Chancellor."  *See* D.C. Code § 38-174; *Thompson v. District of Columbia*, 978 A.2d 1240, 1242 (D.C. 2009).

*First*, the settlement agreement cannot reasonably be read to predetermine McKinney's "eligibility" for any teaching position at DCPS.  District of Columbia law "adheres to an 'objective' law of contracts,'" which means that a contract's "'written language . . . will govern the rights and liabilities of the parties [regardless] of the intent of the parties at the time they entered into the contract,' . . . 'unless the written language is not susceptible of a clear and definite undertaking or unless there is fraud, duress, or mutual mistake.'" *Apprio, Inc. v. Zaccari*, 104 F.4th 897, 906 (D.C. Cir. 2024) (quoting *Dyer v. Bilaal*, 983 A.2d 349, 354-55 (D.C. 2009)).  Courts must therefore "honor the intentions of the parties as reflected in the settled usage of the terms they accepted in the contract, and will not torture words to import ambiguity." *Bragdon v. Twenty-Five Twelve Assocs.*, 856 A.2d 1165, 1170 (D.C. 2004) (internal quotation marks and citation omitted).

The settlement agreement is not ambiguous.  It states that McKinney is "allowed to apply for teaching positions at DCPS starting the 2020-2021 school year." JA 24.  The word "allow" "has no rigid or precise meaning" in the law, *Allow,* Black's Law Dictionary 101 (4th ed. 1968), https://tinyurl.com/m9rc89e3;  in common parlance it means "to give permission for someone to do something."[6]  To "apply" for something is to "make a formal request" for it.  *Apply*, Black's Law

---

[6]     *See Allow*, Cambridge Dictionary, https://tinyurl.com/9w43c2uy (last visited Sept. 17, 2024).

Dictionary (12th ed. 2024).  DCPS thus promised to allow McKinney to formally request appointment to any teaching position that would begin in the fall of 2020 or thereafter.  McKinney has offered no authority, or even reasoned argument, supporting his claim that DCPS somehow agreed to find him "eligible" for any such position.[7]  Instead, as discussed *infra* at pp. 51-52, DCPS simply promised that McKinney would not be subject to the three-year bar on reapplication that would otherwise have applied when he chose the $25,000 "buyout" option.  *See* JA 24; CBA 30.

Moreover, even if the settlement agreement had guaranteed McKinney's "eligibility," it could not have created a property interest because it is not clear what right that status would confer.  *See Town of Castle Rock*, 545 U.S. at 763 (holding that a person cannot be "safely deemed 'entitled' to something when the identity of the alleged entitlement is vague"); *Teigen v. Renfrow*, 511 F.3d 1072, 1081 (10th Cir. 2007) ("A right under state law may establish a property interest only if it is specific and presently enforceable.").  McKinney does not specify what right he believes he was granted, and many types of "eligibility" for teaching positions are beyond DCPS's authority to guarantee.  *See District of Columbia v. Greene*, 806

---

[7]    McKinney appears to rely on *Association of Accredited Cosmetology Schools v. Alexander*, 979 F.2d 859, 864 (D.C. Cir. 1992).  *See* Br. 21.  But that case only involved the retroactive effect of a regulation, and did not address the existence of a constitutionally protected property interest in "eligibility" for a government job.

A.2d 216, 222 (D.C. 2002) ("It is a basic principle of District law that a contracting official cannot obligate the District to a contract in excess of his or her actual authority.").  For example, if DCPS promised McKinney he would be "eligible" regardless of the results of his background check, that promise would impermissibly conflict with the Background Check Act.  *See* D.C. Code §§ 4-1501.03(a) (requiring background checks for all applicants for teaching positions), 4-1501.05a(a) (requiring DCPS to deny employment if "the applicant poses a present danger to children or youth").  Or, if McKinney is claiming that DCPS promised he was "eligible" to teach in any position he sought, that promise would impermissibly conflict with the authority of the Office of the State Superintendent of Education to establish standards for sub-specializations.  *See* 5A DCMR § 1602.1.

*Second*, and alternatively, a guarantee of eligibility could not have created a property interest because DCPS did not promise that McKinney would actually be hired.  While property interests can arise out of contractual rights, not every contractual right creates a constitutionally protected property interest.  "To hold otherwise would run the risk of transmogrifying virtually every dispute involving an alleged breach of contract by a state or a state agency into a constitutional case." *Massó-Torrellas v. Municipality of Toa Alta*, 845 F.3d 461, 467 (1st Cir. 2017) (quoting *Redondo-Borges v. U.S. Dep't of Hous. & Urb. Dev.*, 421 F.3d 1, 10 (1st Cir. 2005); *see id.* & n.5 (noting that "[t]his principle is well established in other

24

circuits," citing cases); *see also Unger v. Nat'l Residents Matching Program*, 928 F.2d 1392, 1399 (3d Cir. 1991) (holding that a contract creates a property interest only if it confers special status, "such as those 'characterized by a quality of either extreme dependence in the case of welfare benefits, or permanence in the case of tenure"); *Omni Behavioral Health v. Miller*, 285 F.3d 646, 652 (8th Cir. 2002) (similar); *S & D Maint. Co. v. Goldin*, 844 F.2d 962, 966-67 (2d Cir. 1988) (similar).

Instead, to create a property interest, a contract must guarantee a "*substantive entitlement.*" *Campbell v. Champaign*, 940 F.2d 1111, 1113 (7th Cir. 1991) (emphasis added). "Eligibility" for that entitlement is not enough because a right to be "fairly considered" "is not itself a substantive right, but rather a vehicle for arriving at the ultimate . . . decision." *Teigen*, 511 F.3d at 1081. "To count as a deprivation of property under the Constitution, a breach of contract must be a breach of a contractual entitlement to property, not a breach of a contractual entitlement to some extra consideration that will result in a job offer only if some other, highly uncertain condition is satisfied." *Yatvin v. Madison Metro. Sch. Dist.*, 840 F.2d 412, 417 (7th Cir. 1988).

Federal circuit courts have thus consistently refused to find a property interest in a person's "eligibility" for a job, promotion, or contract. For example, in *Jordan v. Strougther*, 2022 WL 620119 (6th Cir. 2022), a terminated basketball coach who was promised in a settlement agreement that he was "permitted to apply" for new

positions claimed that the school district deprived him of a property interest by refusing to consider him for a vacancy. *Id.* at *2. The Sixth Circuit affirmed dismissal because the contract "in no way guaranteed that [he] would be considered or interviewed for (let alone offered) any coaching position." *Id.* at *4. Similarly, in *MacFarlane v. Grasso*, 696 F.2d 217 (2d Cir. 1982), a military officer claimed that he was deprived of a property interest when hiring officials refused to consider his job application, arguing that he was entitled to the job because regulations established his superior qualifications and required selection of the most qualified candidate. *Id.* at 222. The Second Circuit affirmed dismissal because the law "merely established his eligibility" for the position and did not eliminate the hiring officials' "discretion . . . in appointments." *Id.*; *see also Moore v. Muncie Police & Fire Merit Comm'n*, 312 F.3d 322, 327 (7th Cir. 2002) (holding that a police officer "ha[d] no property interest in a *prospective* promotion, even when placed on an eligibility or ranking list"); *Ferencz v. Hairston*, 119 F.3d 1244, 1247 (6th Cir. 1997) (contractor had no property interest in remaining on eligible-bidder list because "the city's discretion in determining the 'best' bid forecloses any claim that being listed guarantees any contracts"); *Burns v. Sullivan*, 619 F.2d 99, 104 (1st Cir. 1980) (police officer had no property interest in placement on promotion-eligibility list because the deciding official had substantial discretion to consider subjective factors).

*Third*, even if DCPS had promised McKinney that he would be rehired, this still would not establish a property interest because newly hired teachers must complete a probationary period.  "Whether a government employee has a constitutionally protected property interest in her position turns on the extent of any substantive limitations on the government's authority to remove her." *Esparraguera v. Dep't of the Army*, 101 F.4th 28, 33 (D.C. Cir. 2024).  And if a newly hired employee does not have a property interest in his position, neither can a person who has a legitimate claim of entitlement to be selected for that position.  Thus, in *Jones v. City of Boston*, 752 F.3d 38 (1st Cir. 2014), the First Circuit rejected a job applicant's property-interest claim, even though she had received a binding job offer, because the position had a "six-month probationary period." *Id.* at 56.  "Consequently, even had [she] begun to work, she would have had no cognizable property interest in continued employment during the entirety of her probationary period. *A fortiori*, having not begun work, [she] also had no cognizable property interest based on the job offer alone." *Id.*

All newly hired DCPS teachers serve a one-year probationary period, during which they are subject to termination without cause. *See* D.C. Code § 1-608.01a(b)(2)(C)(i) (establishing probationary period, during which the employee "may be terminated without notice or evaluation"); 5E DCMR § 1400.2(j) (excluding probationary employees from "just cause" standard for adverse action).

27

Newly hired teachers thus "have no property interest in their newly acquired [employment] status." *Esparraguera*, 101 F.4th at 36.

The authorities McKinney cites do not undermine any of these three independent bases for rejecting his argument as to "eligibility." He relies on *Harhay v. Town of Ellington Bd. of Educ.*, 323 F.3d 206 (2d Cir. 2003), where the court found that a laid-off teacher had a constitutionally protected property interest in reappointment. But that case is wholly distinguishable: the collective bargaining agreement required her placement on a "reappointment list" and "entitled" her to appointment to "any position that became vacant for which [she was] qualified." *Id.* at 209; *see* Br. 21. That teacher's property interest did not arise out of her *eligibility* for reappointment—she was entitled to reappointment itself, without any discretionary decision-making on the part of the school district. *Id.* at 209, 212-13.

He also relies on *Stana v. School District of City of Pittsburgh*, 775 F.2d 122 (3d Cir. 1985), where a prospective employee was found to have a property interest in remaining on an eligibility list. *Id.* at 126-27; *see* Br. 21. There, however, the school district was required by statute to maintain a ranked eligibility list of applicants and could only hire from the top three names on the list. *Id.* at 124. Because the school district had an "established policy" that names would be retained on the list for at least two years, the Third Circuit found that a teacher had a property interest in keeping her name on that list. *Id.* at 126-27. The court acknowledged

that this was an unusual case, distinguishing it "from other 'eligibility list' cases" because "a place on the eligibility list was the central factor in the School District's communicated policy to award teaching positions." *Id.* at 127 n.3 (citing cases). Indeed, the Third Circuit has subsequently distinguished *Stana* and refused to find property interests arising out of other eligibility lists where no such policy was in place. *See Tundo v. County of Passaic*, 923 F.3d 283, 289 (3d Cir. 2019) (holding that applicants had no property interest in remaining on eligibility list because state officials had "broad discretion to remove anyone from its lists"); *Anderson v. City of Philadelphia*, 845 F.2d 1216, 1220 (3d Cir. 1988) (no property interest in placement on eligibility list because it "entitled the plaintiffs to nothing more than consideration for employment").

McKinney does not allege that the settlement agreement gave him any preferred status over other applicants, much less a statutory right to be on a ranked list that limited DCPS's discretion regarding who to hire. Instead, as discussed, District law gives the DCPS Chancellor sole discretion to make hiring decisions, eliminating any possibility that McKinney has a constitutionally protected property interest in his "eligibility" for employment. *See* 5E DCMR § 1006.6.

29

**C.    McKinney has forfeited any claim arising out of job offers allegedly made by school principals, and, in any event, those offers could not have been binding on DCPS.**

In his brief, McKinney claims that he had a property interest in two positions for which he received offers of employment from school principals.  Br. 22-23.  But he did not make this argument in the district court.  Instead, as discussed, he argued that the "settlement agreement . . . is the source of [his] property interest," RD 8 at 8, which, he claimed, entitled him "to have his application handled by DCPS fairly and in good faith" and "to hold DCPS accountable in processing his application," RD 8 at 7.  He has thus forfeited any claim that he was entitled to placement in the positions he was allegedly offered.  *See Tinius*, 77 F.4th at 698.

Anyway, even if the Court were to consider this claim, it should be dismissed for two independent reasons.  *First*, school administrators are not authorized to make binding job offers on behalf of DCPS.  Only the DCPS Chancellor has "discretionary authority to fill any position in the Educational Service."  5E DCMR § 1006.6.  And even offers made by the Chancellor are, by statute, "contingent upon receipt of a satisfactory background check."  D.C. Code § 4-1501.03(e).  McKinney does not allege that he received any job offers from the DCPS Chancellor or an authorized designee, nor does he cite any authority suggesting that a "contingent" job offer can confer a constitutionally protected property interest.  *See* JA 8, 12-13.  These statutory and regulatory restrictions make any contrary allegation in his complaint

30

implausible.  *See Orange v. District of Columbia*, 59 F.3d 1267, 1271 (D.C. Cir. 1995) ("It is well-established that those who contract with a municipal corporation are imputed with knowledge of the limits of the agent's actual authority.").

*Second*, even a binding job offer cannot create a property interest if an employee in that position can be terminated without cause.  *See Jones*, 752 F.3d at 56 (rejecting job applicant's property-interest claim, even though she had received a binding job offer, because the position had a "six-month probationary period").  As discussed, newly hired DCPS teachers serve a one-year period of probation, during which they can be terminated without cause.  *See* D.C. Code § 1-608.01a(b)(2)(C)(i); 5E DCMR § 1400.2(j).  This means that, even if McKinney could plausibly allege that he accepted binding offers of employment, those offers could not have created a property interest because the jobs he allegedly accepted would not have given him career-service protection.

## II.    McKinney Has Forfeited The Only Liberty-Interest Claim He Pursues On Appeal And, In Any Event, Does Not Plausibly Allege That DCPS Infringed Upon A Constitutionally Protected Liberty Interest.

This Court has recognized three types of liberty-interest claims related to governmental employment.  *First*, under a "reputation plus" theory, the government can implicate a "liberty interest in reputation" if it "defame[s] [an employee] in the course of job termination."  *Doe v. U.S. Dep't of Just.*, 753 F.2d 1092, 1108 n.15, 1111 (D.C. Cir. 1985).  *Second*, under a "stigma plus" theory, the government can

implicate a person's liberty interest in pursuing his chosen occupation if it takes an adverse action that has "the broad effect of largely precluding [him] from pursuing [his] chosen career." *O'Donnell v. Barry*, 148 F.3d 1126, 1141 (D.C. Cir. 1998). *Third*, under a "debarment" theory, the government can implicate this same occupational liberty interest if it "formally debars an individual from certain work." *Abdelfattah v. U.S. Dep't of Homeland Sec.*, 787 F.3d 524, 538 (D.C. Cir. 2015); *see Trifax Corp. v. District of Columbia*, 314 F.3d 641, 643-44 (D.C. Cir. 2003); *Kartseva v. Dep't of State*, 37 F.3d 1524, 1528 (D.C. 1994).[8]

McKinney has not properly preserved a claim under any of these theories. In the district court, he pursued the first two—"reputation plus" and "stigma plus"—but he has forfeited those claims by failing to defend them in his opening brief. Instead, McKinney now pursues only the third, "debarment" theory, arguing that DCPS deprived him of a liberty interest by formally debarring him from DCPS employment. But he forfeited *this* claim by failing to raise it the district court.

---

[8]    This Court sometimes uses the "stigma-plus" label to describe both the second and third theories, perhaps because both involve the same occupational liberty interest. *See, e.g.*, *Lea v. District of Columbia*, 2024 WL 3042182, *2 (D.C. Cir. 2024) (describing two distinct "stigma-plus" theories). One theory is based on an infringement that is "sufficiently broad"; the other on an infringement that is "sufficiently formal." *Taylor v. Resol. Tr. Corp.*, 56 F.3d 1497, 1506 (D.C. Cir. 1995). For clarity, this brief refers to claims of sufficiently broad infringement as "stigma plus" and claims of sufficiently formal infringement as "debarment."

Even if this Court were to consider any of these claims, they are meritless. McKinney cannot state a "reputation plus" claim because he was neither defamed nor terminated. He cannot state a "stigma plus" claim because he has already found work in his chosen field. And he cannot state a "debarment" claim because: (1) he alleges that DCPS did *not* formally determine that he failed a background check; (2) had it done so, he had a statutorily guaranteed right to appeal; and (3) in any event, a single municipal agency's rejection of an applicant does not rise to the level of constitutional deprivation.

### A. McKinney has forfeited his "reputation plus" claim on appeal and, alternatively, cannot satisfy either of its essential elements.

A reputational liberty interest can be infringed when a government employee is "defamed in the course of job termination." *Doe*, 753 F.2d at 1108 n.15. Under this "reputation plus" theory, a plaintiff must prove: (1) "an act of defamation"; (2) "made in 'conjunction' with an adverse employment action." *Langeman v. Garland*, 88 F.4th 289, 296 (D.C. Cir. 2023) (quoting *O'Donnell*, 148 F.3d at 1140). Both elements are essential. "[I]njury to reputation cannot occur in the absence of public disclosure of the allegedly damaging statements." *Orange*, 59 F.3d at 1274; *see Doe v. Cheney*, 885 F.2d 898, 910 (D.C. Cir. 1989). And "it is necessary . . . that the defamation be accompanied by a discharge from government employment or at least a demotion in rank and pay." *O'Donnell*, 148 F.3d at 1140 (quoting *Mosrie v. Barry*, 718 F.2d 1151, 1161 (D.C. Cir. 1983)).

33

McKinney's "reputation plus" theory fails for multiple reasons. *First*, he forfeits it on appeal. The district court dismissed McKinney's "reputation plus" claim because "he was neither discharged nor demoted from an employment position when the District made reference to a failed background check." JA 40-41. McKinney does not challenge this ruling on appeal. Although he notes that the court "expressed sympathy" for his concerns about future defamation, he does not argue that the district court was wrong to require that he be terminated or demoted. Br. 24 (citing JA 43); *see Gov't of Manitoba v. Bernhardt*, 923 F.3d 173, 179 (D.C. Cir. 2019) (holding that a party forfeits any argument when it only mentions it "in the most skeletal way, leaving the court to do counsel's work, create the ossature for the argument, and put flesh on its bones").

*Second*, even if preserved, McKinney waived any "reputation plus" claim he might have had by entering into the settlement agreement, in which he released all claims "arising out of or relating in any manner to his termination of employment by and separation from employment with DCPS." JA 26. Because a "reputation plus" claim can only arise out of a termination or demotion, McKinney's broad release of any claim arising out of his separation necessarily encompasses any "reputation plus" claim he might otherwise have pursued. *See Bolling Fed. Credit Union*, 475 A.2d at 385.

*Third*, and in any event, the district court properly dismissed this claim on the merits because McKinney's complaint does not plausibly allege either of the essential elements. McKinney alleges that he voluntarily resigned, so he cannot claim that he was terminated or demoted. *See* JA 7, 24; *Gen. Elec. Co. v. Jackson*, 610 F.3d 110, 121 (D.C. Cir. 2010) ("[I]t i[s] th[e] alteration of legal status which, combined with the injury resulting from the defamation, justif[ies] the invocation of procedural safeguards."). And nothing in his complaint suggests that DCPS "publicized the charges against him."[9] *Crooks v. Mabus*, 845 F.3d 412, 420 (D.C. Cir. 2016) (citing *Doe*, 753 F.2d at 1108). Instead, DCPS agreed to remove the investigation and notice of the substantiated sexual harassment allegation from his official personnel folder and keep the nature and terms of the settlement agreement confidential. JA 26-27. McKinney does not allege that DCPS failed to satisfy these promises.

*Fourth*, and finally, even if McKinney had alleged that he was terminated and defamed, he concedes that he was given the only process he could have been due: "an opportunity to clear his name." *McCormick v. District of Columbia*, 752 F.3d 980, 989 (D.C. Cir. 2014) (quoting *Codd v. Velger*, 429 U.S. 624, 627 (1977)). Although his complaint is vague on the details, it alleges that, during the 2018 school

---

[9]    DCPS was statutorily prohibited from publishing its alleged determination that he failed a background check. *See* D.C. Code § 4-1501.08.

year, a "dispute regarding [his] employment at DCPS" led to his placement on administrative leave. JA 6. The settlement agreement provides additional context, confirming that the "dispute" arose out of McKinney's "separation from DCPS" and the "substantiated sexual harassment allegations" against him. JA 24. McKinney alleges that he and DCPS "litigated" this dispute "administratively" before "resolv[ing] all the issues between them by entering into a written settlement agreement." JA 7. McKinney thus had ample opportunity to clear his name—he simply chose to settle the dispute rather than proceed with the administrative litigation that had already begun. *See McCormick*, 752 F.3d at 990 (holding that terminated corrections official received due process because he "could have pursued an action for review, including one for severance, in the Superior Court").

**B.    McKinney has forfeited his "stigma plus" claim and, alternatively, does not allege that he was unable to find work in his chosen field.**

The "stigma plus" theory recognizes that, even in the absence of defamation, a person can be deprived of an occupational liberty interest if governmental action has "the broad effect of largely precluding [him] from pursuing [his] chosen career." *O'Donnell*, 148 F.3d at 1141. This type of claim is thus "predicated on a 'combination of an adverse employment action' and 'a stigma or other disability that foreclosed [the plaintiff's] freedom to take advantage of other employment opportunities.'" *Langeman*, 88 F.4th at 297. The standard for this injury "is high": the government's actions "must substantially reduce the value of his human capital,

as it would if his skills were highly specialized and rendered largely unmarketable." *Taylor v. Resol. Tr. Corp.*, 56 F.3d 1497, 1506-07 (D.C. Cir. 1995). In *O'Donnell*, for instance, a "very senior" police official who had planned to become "chief of police in a 'major city'" claimed that his demotion "eliminated him from any real consideration for [such] positions." 148 F.3d at 1130, 1132, 1141. This Court held that he could not "make out a [stigma-plus] claim" because, "[a]fter his complaint was filed, he became police chief in Brunswick, Maryland, whose population is 6,000," which "demonstrat[ed] that the stigma he suffered cannot have been too disabling." *Id.* at 1141.

The district court correctly relied on this precedent, finding McKinney's claim "undermine[d]" by "the fact that [he] currently teaches and coaches a public school in Maryland." JA 42. As the district court explained, like in *O'Donnell*, McKinney's "current job 'demonstrates that the stigma he suffered cannot have been too disabling' such that his ability to pursue his chosen profession has been 'seriously affected, if not destroyed.'" JA 42-43 (quoting *O'Donnell*, 148 F.3d 1141-42).[10]

---

[10]    Because it dismissed on this ground, the district court declined to reach the District's alternative argument: that McKinney did not suffer an adverse action, which is also needed for a "stigma plus" claim. *See* JA 41-42. McKinney's brief also fails to address this requisite element. *See* Br. 24-26.

McKinney has not preserved a challenge to this holding on appeal—indeed it is not clear whether his opening brief even mentions the "stigma plus" claim he brought in the district court. It states only that DCPS deprived him of a reputational liberty interest "by falsely labeling him as someone who presents a danger to children and youth, *and who is ineligible to teach in D.C.*" Br. 10 (emphasis added); *see* Br. 24 (same); RD 8 at 11 (arguing in the district court that DCPS's action precluded him from employment in "any private school in the District" and thus 'foreclosed [him] from entering the field' of education in the entirety of the jurisdiction of the District of Columbia"). But even if this fragment of a sentence was meant to preserve a "stigma plus" claim, McKinney does support it with any argument suggesting that he has alleged the type of injury required under *O'Donnell*. *See* Br. 25-26; *Abdelfattah*, 787 F.3d at 540 (rejecting "asserted but unanalyzed arguments"). If anything, his brief disavows this claim, explaining that his liberty interest claim is based on "the first category outlined in *Kartseva*" (the "debarment" theory) and complaining that the district court "erroneously focused on the second category" (the "stigma plus" theory). Br. 25-26.

Alternatively, this claim fails on the merits because McKinney cannot plausibly allege that DCPS has "seriously affected, if not destroyed" his ability to find work in his chosen field. *O'Donnell*, 148 F.3d at 1142 (quoting *Kartseva*, 37 F.3d at 1529). As discussed, *O'Donnell* held that any stigma a high-ranking police

officer suffered from a demotion "cannot have been too disabling" because he found another job in his field, albeit one in which his "overall responsibilities have certainly dwindled." 148 F.3d at 1141. And in *Abdelfattah*, the Court rejected a software engineer's stigma-plus claim because "at the time [plaintiff] filed his First Amended Complaint, he claimed to still be working as a software engineer." 787 F.3d at 539.

Just like the plaintiffs in *O'Donnell* and *Abdelfattah*, McKinney has already found work in his chosen field. By the time he brought this lawsuit in May 2022, he was employed as a teacher and coach in Prince Georges County—a neighboring school district where he already lived. JA 5; *see* JA 14 (alleging that his chosen field is as a "health and physical education teacher" who "also coaches the sports of football and basketball"). JA 4. To be sure, he alleges that DCPS pays its teachers more than Prince George's County, but he identifies no other difference between the jobs. *See* JA 15-16. Unlike the employee in *Kartseva*, who "was disqualified, for unknown but potentially serious reasons, from an uncertain and perhaps a broad range of government employment," *O'Donnell*, 148 F.3d at 1141, McKinney's new job shows that any stigma created by DCPS cannot have infringed upon his ability to pursue his chosen occupation. *See Blantz v. Cal. Dep't of Corr. & Rehab., Div. of Corr. Health Care Servs.*, 727 F.3d 917, 925 (9th Cir. 2013) ("Stigmatizing

statements that merely cause reduced economic returns . . . do not constitute a deprivation of liberty." (internal quotation marks omitted)).

Finally, it is worth noting that the Background Check Act squarely forecloses McKinney's unpreserved argument, made only in the district court, that failing a DCPS background check would preclude him from teaching in *any* school in the District, including public charter and private schools. *See* RD 8 at 11. Under the Act, District officials can conduct background checks on only people who apply for positions with "a District agency." D.C. Code § 4-1501.05(a). Other covered entities, such as private schools, must conduct their own background checks and make their own suitability determinations. *See* D.C. Code § 4-1501.03. And the Act prohibits DCPS from revealing its background-check determinations to those schools without the subject's consent. *See* D.C. Code § 4-1501.08.

### C. McKinney did not preserve a "debarment" claim in the district court, nor, in any event, would such a claim have merit.

On appeal, McKinney's sole liberty-interest argument is based on a debarment theory—which he describes as the "first category outlined in *Kartseva*." Br. 25. But he did not preserve this claim in the district court. Instead, as discussed, he pursued only a reputation-plus claim, *see* RD 8 at 10-11 (arguing that DCPS "defam[ed]" him because "he will be obliged to report" his failed background check to prospective employers), and a stigma-plus claim, *see* RD 8 at 11-12 (arguing that he need not allege preclusion from teaching positions "everywhere on planet Earth"—

40

it was enough to allege that DCPS would "shar[e] the adverse information" with private schools, which would prevent him from teaching "in the entirety of the jurisdiction of the District of Columbia"). He did not argue that he had a liberty interest in employment with DCPS itself, or even that DCPS had formally debarred him from all future employment. *See* RD 8. He has thus forfeited any such claim on appeal. *See Tinius*, 77 F.4th at 698.

Nor, in any event, does McKinney plausibly allege the type of "debarment" that can rise to the level of a liberty interest deprivation. His claim fails for two independent reasons. *First*, according to his complaint, he was *not* formally debarred by DCPS. A "formal," "binding" determination is the crux of a "debarment" claim. *Lea*, 2024 WL 3042182, at *2. This is what distinguishes it from "stigma plus," which requires proof that the agency's action broadly precluded the plaintiff from employment in his chosen field. A plaintiff who cannot meet this high standard can show a "status change" only if "h[is] disqualification from future opportunities is automatic or formal." *Kartseva*, 37 F.3d at 1529; *see id.* at 1528 (explaining that a decision that "does not have this *binding* effect" can implicate a liberty interest only if it has the "*broad* effect of largely precluding [the plaintiff] from pursuing her chosen career"); *Campbell v. District of Columbia*, 894 F.3d 281, 289 (2018) (similar); *O'Donnell*, 148 F.3d at 1141 (similar).

41

McKinney does not allege that DCPS made a formal, binding decision that automatically excluded him from teaching positions with DCPS. He alleges the opposite: that DCPS did *not* make a formal, binding decision that he had failed a background check. According to his complaint, "no background check of [him] had, in fact, been conducted," JA 8, *see* JA 11-13 (similar), and he was only told that he had failed one because a senior DCPS official "instructed [subordinates] . . . not to effectuate [McKinney's] hiring," JA 14. These allegations, which at this stage of the litigation are presumptively true, belie any inference that DCPS formally determined that McKinney failed a background check and was thus ineligible for employment.

Moreover, even if DCPS *did* formally determine that McKinney failed his background check, that decision could not have had a "binding effect" that "automatically exclude[d]" him from more than one teaching position. *Campbell*, 894 F.3d at 289 (quoting *Kartseva*, 37 F.3d at 1528). An applicant for a teaching position who fails a background check is disqualified from employment for only the particular job he sought. Nothing prevents him from applying for another teaching position, in which case a new background check is run and new suitability determination made. DCPS may, in its discretion, rely on an adverse suitability determination for a similar position made in the past year, but that reliance is not automatic. *See* 6B DCMR § 406.9 (permitting DCPS, "at its discretion," to rely on

an adverse background check for up to one year).  Moreover, even where DCPS exercises its discretion to rely on a past adverse determination, it can do so for only one year.  *See* 6B DCMR § 406.10.

*Second*, if this Court even reaches the question, what is at most a one-year preclusion from employment in a single school district does not implicate a constitutionally protected liberty interest.  In *Langeman*, an FBI agent who was summarily terminated for mishandling a high-profile investigation claimed that he was deprived of a liberty interest because "his prospects for future employment with the [FBI] have been foreclosed."  88 F.4th at 296.  Although this Court addressed his stigma-plus and debarment claims in the same paragraph—referring to the former as "broad preclusion" and the latter as "automatic exclusion"—it provided separate analyses for each.  And it rejected his debarment claim because, even assuming that he was "excluded from working with the FBI again," he could not "demonstrate the automatic exclusion . . . outlined in *Kartseva*" because he had not alleged "that he would be unable to find employment with *any other federal agency indefinitely*."  *Id.* at 297 (emphasis added).

The Ninth Circuit applied a similarly high standard for debarment in *Llamas v. Butte Cmty. Coll. Dist.*, 238 F.3d 1123 (9th Cir. 2001), where a community college issued a termination letter that "barred [the employee] from all future employment with the [school district]."  *Id.* at 1126.  The court affirmed dismissal, explaining

43

that, while "due process protects a 'generalized . . . right to choose one's field of *private* employment," "people do not have liberty interests in a specific employer" or even "'in [a] civil service career.'" *Id.* at 1128 (emphasis added) (quoting *Clemente v. United States*, 766 F.2d 1358, 1365 (9th Cir. 1985)). Because the employee had "only been foreclosed from working for the [school district]," his debarment from that agency did not rise to the level of a liberty-interest deprivation. *Id.*; *see also Blantz*, 727 F.3d at 925 (rejecting debarment claim where employee was barred from future employment with one state agency but was free to seek positions with others).

A determination by DCPS that an applicant has failed a background check, as alleged, has even less of an effect on future employment than the debarments found insufficiently injurious in *Langeman* and *Llamas*. In those cases, the plaintiffs were formally barred from *ever* working with the agency again. *See Langeman*, 88 F.4th at 296; *Llamas*, 238 F.3d at 1128. Here, as discussed, DCPS is not required to apply a failed background check to future applications. 6B DCMR § 406.9. Moreover, its discretion to do so is strictly limited—DCPS cannot rely on a failed background check for more than a year, after which it must conduct a new background check and make a fresh determination. *See* 6B DCMR § 406.10. An adverse background-check determination therefore cannot rise to the level of a liberty-interest deprivation. If the permanent debarment of a criminal investigator from the nation's

largest law enforcement agency does not implicate a liberty interest, neither can a one-year exclusion of a teacher from employment in a single school district. *Langeman*, 88 F.4th at 296.

This conclusion also properly aligns the threshold standard for "debarment" with "stigma plus." Both implicate the same liberty interest: the "right to . . . follow a chosen profession free from unreasonable governmental interference." *Trifax*, 314 F.3d at 643 (referring to the former as "formal debarment" and the latter as "broad preclusion"). And this Court has acknowledged that a "stigma plus" deprivation is "equivalent in every practical sense to formal debarment." *Id.* at 643-44. The theories of "debarment" and "stigma plus" are thus best understood as different mechanisms—formal and informal—by which agency action can infringe on an occupational liberty interest. And it would be odd if the mere formality of a preclusion, regardless of its severity or scope, created a constitutional deprivation. Instead, like with "stigma plus" claims, plaintiffs bringing "debarment" claims must demonstrate that they are automatically excluded from a broad enough scope of employment to interfere with their "right to . . . follow a chosen profession." *Id.* at 643. A one-year disqualification from employment with DCPS does not rise to that high standard.

McKinney does not address any of this authority. Instead, he quotes dictum in *Kartseva*, where the Court suggested that, if the State Department formally

excluded a Russian translator from work "on some category of future State contracts or from other government employment opportunities," that action would have "change[d] her formal legal status and thus implicate[d] a liberty interest."  Br. 25 (quoting *Kartseva*, 37 F.3d at 1528); *see Moore v. Agency for Int'l Dev.*, 80 F.3d 546, 548 (D.C. Cir. 1996) (describing *Kartseva*'s remand guidance as "dicta").  But *Kartseva* did not consider whether the plaintiff had a liberty interest in working for a single government agency, much less whether that interest would be implicated by a *temporary* debarment from a *municipal* agency.  That plaintiff had lost her job with a private company that contracted with the State Department, and it was not clear whether the State Department's action had barred her from working on *all* future State Department contracts, regardless of who employed her.  As the Court explained in *O'Donnell*, "Kartseva was disqualified, for unknown but potentially serious reasons, from an *uncertain and perhaps broad* range of government employment." 148 F.3d at 1141.  It was that uncertainty that allowed her to plausibly allege that the government's actions had "render[ed] her unemployable in much of her field."  *Id.* Here, in contrast, even if DCPS had formally determined that McKinney failed a

background check, that decision could at most have precluded him from future employment with DCPS, and even then, for only one year.[11]

Finally, even if this Court were to consider this unpreserved claim and hold that DCPS's background-check determination implicated a liberty interest, it should affirm dismissal because McKinney was provided all the process he was due: an opportunity to appeal to a neutral adjudicative body. *See Old Dominion Dairy Prods. v. Sec'y of Def.*, 631 F.2d 953, 968 (D.C. Cir. 1980).  The Background Check Act guarantees this relief, stating that, "[i]f an application is denied because the applicant presents a danger to children or youth, the [personnel authority] shall inform the applicant in writing and the applicant may appeal the denial to the Commission on Human Rights."  D.C. Code § 4-1501.05a(c).

McKinney argues that he was "unable to appeal . . . to the Commission on Human Rights because DCPS never provided him with the necessary materials."  Br. 6; *see* JA 9 (alleging that he could not appeal because the DCPS Office of Security did not send him "a paper, written notice of its determination").  But the Background Check Act does not predicate the appeal right on the agency's issuance of a "paper"

---

[11]     McKinney also relies on the district court's decision in *Lea v. District of Columbia*, No. CV 22-1396 (JEB), 2022 WL 3153828 (D.D.C. Aug. 8, 2022), which denied a motion to dismiss an attorney's claim that the Mayor's unsuitability determination barred her from future jobs with any District agency.  Br. 26.  This Court, however, declined to consider the question, instead affirming on different grounds.  *See* 2024 WL 3042182, at *2.

notice giving the reasons for its decision. *See* D.C. Code § 4-1501.05a(c). It requires only that the agency "inform the applicant in writing" that he failed a background check which, according to McKinney, DCPS repeatedly did. *See* JA 8 ("In August 2020, Mr. McKinney was advised by email that the DCPS Career Office had been informed that the DCPS Office of Security had found him ineligible because of an allegedly 'failed' background check."), 11 (similar), 13 (similar).

Nor is it dispositive that DCPS allegedly failed to send him "the instructions for appeals rights and procedures." JA 10. In *McCormick*, this Court rejected a terminated employee's "stigma-plus" claim because, even assuming his termination broadly precluded him from obtaining work in his chosen field, a District statute gave him the right to "pursue[] an action for review, including one for severance, in the Superior Court." 752 F.3d at 990. There was no evidence that the agency notified the employee of this appeal right—indeed, he argued that such relief was not available to him. *Id.* But that argument was "flatly contradicted by" the statute, so the Court held that any deprivation "was not without due process." *Id.*

McKinney's argument is even less persuasive than the one rejected in *McCormick* because McKinney already knew he had a right to appeal an adverse background-check determination to the Commission on Human Rights, and he knew how to do it. When DCPS found that he had failed earlier background checks in 2015, and again in 2019, it sent him "instructions for the appeals process," JA 9,

which he successfully followed, *see* JA 5, 6-7. McKinney does not allege that he tried to follow that process in 2020 and 2021, or that he made any effort to contact the Commission to ask how he could appeal DCPS's determination in the absence of a formal, "paper" decision like the ones he had received in previous years.

"If there is a process on the books that appears to provide due process, the plaintiff cannot skip that process and use the federal courts as a means to get back what he wants." *Alvin v. Suzuki*, 227 F.3d 107, 116 (3d Cir. 2000). McKinney's knowledge of a statutory right to appeal an adverse background-check determination to the Commission on Human Rights, which would have given him ample opportunity to challenge DCPS's determination, defeats any plausible claim that he was deprived of a liberty interest without due process.

## III. McKinney's Complaint Does Not Plausibly Allege That The District Breached An Implied Covenant Of Good Faith And Fair Dealing.

McKinney does not claim that DCPS violated any explicit term of the settlement agreement. Instead, he argues that his right to apply for new positions "include[d] an implied right to have that application considered fairly and reasonably," and that DCPS "arbitrarily rejected all of [his] job applications on the spurious ground that he had failed the background check." Br. 16. The district court properly dismissed this claim.

"Settlement agreements and releases are contractual in nature and are interpreted under the same rules as contracts." *Grand Hyatt Wash. v. D.C. Dep't of*

*Emp't Servs.*, 963 A.2d 142, 146 (D.C. 2008). The District of Columbia follows an "objective law" of contracts, which means that "the written language embodying the terms of an agreement will govern the rights and liabilities of the parties, [regardless] of the intent of the parties at the time they entered into the contract, unless the written language is not susceptible of a clear and definite undertaking." *DSP Venture Grp. v. Allen*, 830 A.2d 850, 852 (D.C. 2003) (quoting *Geiger v. Crestar Bank*, 778 A.2d 1085, 1091 (D.C. 2001)). "[A] court must honor the intentions of the parties as reflected in the settled usage of the terms they accepted in the contract, and will not torture words to import ambiguity." *Bragdon*, 856 A.2d at 1170 (internal quotation marks and citation omitted); *see also Beck v. Cont'l Cas. Co.*, 936 A.2d 747, 751 (D.C. 2007) ("[A] written contract duly signed and executed speaks for itself and binds the parties without the necessity of extrinsic evidence.").

"Every contract contains an implied covenant of good faith and fair dealing." *Sundberg v. TTR Realty, LLC*, 109 A.3d 1123, 1133 (D.C. 2015). "This covenant precludes any party from doing 'anything which will have the effect of destroying or injuring the right of the other party to receive the fruits of the contract.'" *Id.* (quoting *Abdelrhman*, 76 A.3d at 891). "To state a claim for breach of the implied covenant of good faith and fair dealing," a complaint must therefore plausibly allege "'either bad faith or conduct that is arbitrary and capricious.'" *Id.* (quoting *Abdelrhman*, 76 A.3d at 891-92, and *Wright v. Howard Univ.*, 60 A.3d 749, 754

50

(D.C. 2013)).  And that alleged misconduct must interfere with a right guaranteed by the contract, because the covenant of good faith and fair dealing "does not require a party to waive or rewrite the terms of the contract." *Sibley v. St. Albans Sch.*, 134 A.3d 789, 806 (D.C. 2016); *see also E. Shore Mkts., Inc. v. J.D. Assocs.*, 213 F.3d 175, 182 (4th Cir. 2000) (noting that, under the similar common law of Maryland, "the covenant of good faith and fair dealing 'does not obligate a [party] to take affirmative actions that the party is clearly not required to take under [the contract].'" (quoting *Parker v. Columbia Bank*, 604 A.2d 521, 531 (Md. Ct. Spec. App. 1992)).

"[I]n order to determine whether appellees violated the duty of good faith and fair dealing," this Court should begin by "review[ing] the terms of the contract." *Sundberg*, 109 A.3d at 1133.  DCPS and McKinney entered into the settlement agreement to resolve all of their pending disputes, including the "substantiated sexual harassment allegations" (for which discipline remained possible) and his "separation from DCPS" under the "Excessing" procedures established in the CBA. JA 24; *see* JA 7 (alleging that the settlement agreement "resolved all the issues between" McKinney and DCPS).  McKinney released any claims arising out of his separation of employment, including the grievance he had filed challenging the "related substantiated sexual harassment allegations."  JA 24.  In exchange, DCPS allowed McKinney to accept the $25,000 "Excessing option[] offered to teachers pursuant to Article 4.5 of the [CBA]," JA 24, while also taking advantage of the

51

CBA's "Extra Year" option, which allows excessed teachers who do not take the buyout to apply for new positions and, if rehired with one year, incur no break in service, CBA 31-33; *see* JA 24-25.

This context explains the key provision here: "McKinney shall be allowed to apply for teaching positions at DCPS starting the 2020-2021 school year." JA 24. In the district court, McKinney argued that, because he "could have reapplied for employment with DCPS, like any other applicant," this provision gave him a "contract[ual] right to be treated differently—better—than mere applicants." RD 8 at 6. But this interpretation ignores *other* contractual provisions. McKinney's acceptance of the $25,000 "buyout" option meant that, without the "allowed to apply" clause, he would have been prohibited from reapplying for three years. *See* JA 24 (described describing the "buyout" option as the "$25,000 . . . Excess[ing] option[] offered to teachers pursuant to Article 4.5 of the [CBA]"); CBA 30 (Article 4.5, stating that "[a]n excessed . . . Teacher who opts for the buyout shall not be eligible for employment with DCPS for a period of three (3) years"). The "allowed to apply" provision simply gave McKinney the right to submit applications for reemployment even though he had accepted the "buyout" option.

McKinney does not argue that DCPS failed to comply with the plain language of the settlement agreement. *See* Br. 12-17. He thus appears to concede that DCPS paid the $25,000 cash buyout and removed the "substantiated sexual harassment

allegations" from his official personnel folder. *See* JA 7-14. And he does not dispute that he was allowed to apply for reemployment for the upcoming school year, even though he had accepted the "buyout" option. *See* JA 36. Nothing in the contractual terms required DCPS to do anything more. Indeed, the DCPS Chancellor has discretionary authority to hire or reject an applicant without offering reasons for the decision. *See* 5E DCMR § 1006.6. An implied covenant that gave McKinney any additional rights in the hiring process would have "require[d] [DCPS] to . . . rewrite the terms of the contract." *Sibley*, 134 A.3d at 806. The court thus properly dismissed McKinney's contract-based claims.

## CONCLUSION

The district court's dismissal of the complaint should be affirmed.

Respectfully submitted,

BRIAN L. SCHWALB
Attorney General for the District of Columbia

CAROLINE S. VAN ZILE
Solicitor General

ASHWIN P. PHATAK
Principal Deputy Solicitor General

THAIS-LYN TRAYER
Deputy Solicitor General

/s/ Holly M. Johnson
HOLLY M. JOHNSON
Senior Assistant Attorney General
Bar Number 476331
Office of the Solicitor General

Office of the Attorney General
400 6th Street, NW, Suite 8100
Washington, D.C. 20001
(202) 442-9890
(202) 715-7713 (fax)
Holly.Johnson@dc.gov

September 2024

54

## CERTIFICATE OF COMPLIANCE

I certify that this brief complies with the type-volume limitation in Federal Rule of Appellate Procedure 32(a)(7)(B) because the brief contains 12,992 words, excluding exempted parts.  This brief complies with the typeface and type style requirements of Federal Rule of Appellate Procedure 32(a)(5) and (6) because it has been prepared in a proportionally spaced typeface using Microsoft Word 365 in Times New Roman 14-point font.

/s/ Holly M. Johnson
HOLLY M. JOHNSON